IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| SHARON BAKER-BEY, | : | |
| Plaintiff, | : | |
| v. | : | CIVIL NO. 06-CV-5490 |
|  | : | |
| PENNSYLVANIA DEPARTMENT OF CORRECTIONS, | : | |
| Defendant. | : | |
|  | : | |

## MEMORANDUM & ORDER

RUFE, J.                                                                                              July 23, 2008

        Before the Court is the Defendant Department of Correction's ("Defendant" or "DOC") Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).[1] Plaintiff Sharon Baker Bey's ("Plaintiff") Amended Complaint[2] alleges that Defendant subjected her to unlawful discriminatory harassment and a hostile work environment, and retaliated against her for engaging in protected activities in violation of both Title VII of the Civil Rights Act of 1964 ("Title VII")[3] and the Pennsylvania Human Relations Act ("PHRA").[4] Defendant filed a Motion

---

[1] Doc. No. 16.

[2] Doc. No. 12. Plaintiff's original Complaint, Doc. No. 3, was filed pro se on December 21, 2006 after this Court granted Plaintiff's motion to proceed in forma pauperis, Doc. No. 2. In response, Defendant filed a Motion to Dismiss, in part, Plaintiff's Complaint. Doc. No. 5. On April 5, 2007, upon consideration of Plaintiff's request for appointment of counsel, the Court referred the matter to the Employment Panel, and placed it in suspense pending such appointment. On November 7, 2007, the Court appointed counsel for Plaintiff, and directed counsel to file an amended complaint, which was filed and followed by the instant motion.

[3] 42 U.S.C. § 2000e (2003).

[4] Pennsylvania Human Relations Act, 43 P.S. §§ 951 et seq.

to Dismiss Plaintiff's PHRA claim, her Title VII hostile work environment and retaliation claims, and her request for punitive damages. Plaintiff's Response in Opposition withdraws the punitive damages request and PHRA claim.[5] Thus the issues before the Court are the sufficiency of Plaintiff's Title VII retaliation and hostile work environment claims. For the following reasons, Defendant's Motion will be denied.

## I. STANDARD OF REVIEW

Dismissal of a complaint pursuant to Rule 12(b)(6) of the Federal Rule of Civil Procedure for failure to state a claim upon which relief can be granted is appropriate where a "plaintiff can prove no set of facts in support of his claim which would warrant relief."[6] In determining whether a motion to dismiss is appropriate the court must consider those facts alleged in the complaint, accepting the allegations as true and drawing all logical inferences in favor of the non-moving party.[7] "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do."[8] Those factual allegations asserted in

---

[5] Doc. No. 18.

[6] Sung Tran v. Delavau, LLC, No. 07-3550, 2008 WL 2051992, at *1 (E.D. Pa. May 13, 2008) (quoting Cal. Pub. Employees' Retirement Sys. v. Chubb Corp., 394 F.3d 126, 143 (3d Cir. 2004)); see also Conley v. Gibson, 355 U.S. 41, 45-46 (1957).

[7] ALA v. CCAIR, Inc., 29 F.3d 855, 859 (3d Cir. 1994); Fay v. Muhlenberg Coll., No. 07-4516, 2008 WL 205227, at *2 (E.D. Pa. January 24, 2008).

[8] Bell Atlantic Corp. v. Twombly, -- U.S. --, 127 S.Ct. 1955, 1964-1965 (2007).

support of a claim must raise "a right to relief above the speculative level."[9] Throughout the analysis, the issue for the court at this stage remains whether the non-moving party is entitled to offer evidence to prove its factual allegations in support of its claims, not whether the non-moving party will eventually succeed in its claims.[10]

## II. FACTUAL BACKGROUND [11]

In February 2000 Plaintiff began working for Defendant DOC as a probationary employee. As a condition of this probationary employment, Plaintiff was required to attend the DOC Training Academy. After completing the recruitment process, including background checks, medical exams, interviewing, and a civil service exam, Plaintiff was enrolled as a Cadet in the Training Academy. [12]

Plaintiff practices Islam, wearing a head scarf or hijab and praying five times a day as part of her religious practice.[13] Prior to her arrival at the DOC's Training Academy, Plaintiff made a request to her then-supervisor, Stephanie Smith, for a separate dormitory, which would allow her to observe her daily prayers. Ms. Smith made a request on Plaintiff's behalf. [14]

---

[9] Twombly, 127 S.Ct. at 1965.

[10] Fay, 2008 WL 205227, at *1; see also Twombly 127 S.Ct. at 1965.

[11] For the purposes of this Motion, this Court accepts as true the facts as set forth in the Amended Complaint and draws all facts from the Amended Complaint unless otherwise noted.

[12] Amended Compl. ¶¶ 26-28.

[13] Amended Compl. ¶¶ 16-17, 36.

[14] Id. ¶ 37. It is unclear the nature Smith's request or means by which she made it. A statement by Officer Tann, of the DOC training Academy, made in response to Plaintiff's later inquiry into her room assignment, that "I've got five emails about this bullshit," (Amended Compl. ¶ 46) suggests that Smith's request may have been made in the form of an email.

When Plaintiff arrived at the Academy she was housed at a nearby hotel due to over-crowding, but after a week was moved to a small, single dormitory room without a window.[15]

After Plaintiff's original request for housing, supervisory employees of Defendant began "singling out" Plaintiff and closely monitoring her conduct.[16] On May 23, 2003, Officer Ross, Plaintiff's instructor, humiliated Plaintiff in front of the class when he referred to her religious attire as "all this stuff" on her head.[17] Three days later Plaintiff reported "unlawful religious discriminatory harassment, ridicule and insults" on a Basic Training Course Evaluation form,[18] which she submitted to Defendant. Plaintiff reported "unlawful" harassing and insulting conduct on another course evaluation form on at least one subsequent occasion. [19]

On May 30, 2000, when Plaintiff inquired about her room assignment, Officer Rebecca Tann of the Housing Department told her "I'm tired of this bullshit. I've got five emails about this bullshit."[20] After filing a housing request asking Defendant to permit her to share a larger room with another cadet, Plaintiff made a second request to Officer Tann, who responded,

---

[15] Id. ¶¶ 38-39.

[16] Id. ¶ 32.

[17] Id. ¶ 43.

[18] Id. ¶ 44. The term "unlawful" here is not a legal conclusion but reflects the nature of the complaints Plaintiff made on her Course Evaluation form as presented in the Amended Complaint. Plaintiff's Amended Complaint does not discuss the specific language of the complaints made on the Course Evaluation form but suggests that Plaintiffs report conveyed Plaintiff's belief that the harassment, ridicule and insults made against her by agents of the Defendant were unlawful.

[19] Id. ¶ 45.

[20] Id. ¶ 44.

"do they get up at 4:00 a.m. to pray too?"[21]

Also, on May 30, 2000, Plaintiff was handed a disciplinary infraction for leaving her prayer mat on the floor. Sergeant Andrew Repko handed out infractions that day by stating a cadet's name, after which the cadet would identify himself by raising his hand. Sergeant Repko would then walk over to the cadet to hand him his infraction. However, when it came to Plaintiff, Repko did not state Plaintiff's name and allow her to identify herself. Instead he walked over to her and stated her name emphatically.[22] That same day the Plaintiff contacted Stephanie Smith and reported what she perceived as unlawful religious discriminatory harassment by academy officers.[23]

Plaintiff was aware of the disciplinary policies and procedures of the Academy, as they were described in a cadet handbook she received. She was also aware of the discretion afforded Academy officers in enforcing such procedures, including administering verbal reprimands instead of written ones and deciding what offense level to attach to an infraction. Plaintiff alleges Academy officers enforced disciplinary rules against her that were not enforced against other cadets.[24] For example, during her training classes, Plaintiff observed non-Islamic cadets sleeping in class and others running through the hall when they were late; these cadets did not receive disciplinary slips. On June 1, 2000, however, Plaintiff was cited for sleeping in

---

[21] Id. ¶¶ 47-48.

[22] Id. ¶¶ 50-52.

[23] Id. ¶ 53. Again the term "unlawful" is used to describe the nature of the complaints made by the Plaintiff.

[24] Id. ¶¶ 33, 41-42.

class.[25]

On June 2, 2000, Lieutenant Montgomery closely monitored Plaintiff without apparent reason, ultimately following her into a lounge area. Later that day, Lieutenant Montgomery filed a report of the incident recommending Plaintiff's employment be terminated because of her serious infractions and because of the trouble she had caused with respect to housing.[26] On June 6, 2000, after receiving a disciplinary slip for not displaying her name tag on her dormitory bed, Plaintiff received a letter of termination signed by William D. Sprenkle, Director of the Staff Development and Training Office. She was verbally notified that the reason for the termination was her being present on "restricted premises."[27] Plaintiff alleges that these "restricted premises" are an employee lounge, as Plaintiff was never cited for any other infraction involving restricted premises. After Plaintiff received her letter of termination, Officer Tann continued to harass Plaintiff, by ridiculing her religious practice and laughing at her.[28]

On or about June 6, 2000, Plaintiff again contacted Ms. Smith to report unlawful discrimination and remind her of their conversation on May 30, 2000.[29] After being terminated and directed to leave Academy premises, on June 13, 2000, Plaintiff was informed that her termination had been rescinded and that she would be demoted to a position with the Department

---

[25] Id. ¶¶ 55-57.

[26] Id. ¶¶ 59-60.

[27] Id. ¶¶ 63, 65-67 (restricted premises were identified as an employee lounge).

[28] Id. ¶ 68.

[29] Id. ¶ 74.

of Public Welfare.[30]

Plaintiff alleges that the Defendant is responsible for the acts of Officer Ross, Officer Tann, Sergeant Repko, Stephanie Smith, William D. Sprenkle, and Lieutenant Mongomery.[31]

**III. DISCUSSION**

   **A. Retaliation**

Title VII prohibits employers from discriminating against an employee who "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."[32] To establish a *prima facie* case of retaliation under Title VII, a plaintiff must allege that: "(1) she engaged in activity protected by Title VII; (2) the employer took adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action."[33]

Considering the first element, Title VII not only protects the filing of formal charges of discrimination, but also "protects informal protests of discriminatory employment practices, including making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of

---

[30] Id. ¶¶ 73, 77.

[31] Id. ¶ 69-70.

[32] 42 U.S.C. § 2000e-3(a).

[33] Moore v. City of Philadelphia, 461 F.3d 331, 340 (3d Cir. 2006) (quoting Nelson v. Upsala Coll., 51 F.3d 383, 386 (3d Cir. 1995)).

co-workers who have filed formal charges."[34] In Abramson v. William Paterson College of New Jersey, the plaintiff, then a non-tenured professor at defendant college, wrote an informal letter to the college president stating that she felt that a Dean's bias against her "as an Orthodox Jew overwhelm[ed] [the Dean's] professional judgment."[35] The Third Circuit Court of Appeals found this informal letter to be protected conduct, as required by the first retaliation element.[36]

       Defendant argues that Plaintiff has failed to allege that she engaged in protected activity because mere verbal complaints do not constitute protected activity.  Defendant also argues that Plaintiff's alleged protected activity fails to "sufficiently convey concerns about the unlawfulness of [the DOC's] conduct."  However, Plaintiff alleges that she complained of discrimination both orally and in writing, for example, through informal written complaints on "Basic Training Course Evaluation" form. She further alleges that her written complaint reported "unlawful religious discriminatory harassment, ridicule and insults," while her complaint to her immediate supervisor, Smith, described "pervasive and regular unlawful religious discriminatory harassment."[37]  Plaintiff's complaint sufficiently alleges protected activity in the form of informal written and verbal complaints conveying the unlawfulness of the employer's conduct to fulfill the requirement of the first prong of a retaliation claim.

---

[34] Burton v. Pennsylvania Board of Probation and Parole, No. 02-2573, 2002 WL 1332808, at * 5 (E.D. Pa. June 13, 2002) (citing Abramson v. William Paterson Coll. of New Jersey, 260 F.3d 265, 288 (3d Cir. 2001)).

[35] Abramson, 260 F.3d at 287.

[36] Id.

[37] See Amended Compl. at ¶¶ 45, 53 (emphasis added). Although neither ¶ 45 nor ¶ 53 specifies the exact contents of Plaintiff's protest, the Amended Complaint conveys that, through her grievances, Plaintiff made it clear that she believed that Defendant's conduct was unlawful.

The second prong of a retaliation claim requires that Defendant took adverse employment action against Plaintiff. Title VII's retaliation provision "seeks to prevent an employer from interfering with an employee's efforts to secure or advance enforcement of the Act's basic guarantees" of a workplace "where individuals are not discriminated against because of their status" as a member of a protected class.[38] In <u>Burlington Northern and Santa Fe Railway. Co. v. White</u>, the plaintiff, after having complained about sexual harassment, was reassigned from a position as a forklift operator to one as a track laborer.[39] Even though this reassignment fell within the plaintiff's job description, the Supreme Court found that a jury could determine that track laborer duties were more grueling than the plaintiff's previous assignment.[40] In concluding that this undesirable reassignment constituted adverse employment action sufficient for a retaliation claim, the Supreme Court held that the adverse employment actions that the Title VII retaliation provision forbids are not limited "to those that are related to employment" or even those that "occur at the workplace."[41] Instead, to constitute an adverse employment action, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse," meaning the adverse employment action may have caused the plaintiff to reconsider her choice to engage in a protected activity of making a complaint.[42] Here, Plaintiff's demotion, following her alleged complaints of discriminatory treatment, changed her job

---

[38] <u>Burlington N. and Santa Fe Ry. Co. v. White</u>, 548 U.S. 53, 54 (2006).

[39] <u>Id.</u> at 58.

[40] <u>Id.</u> at 70.

[41] <u>Id.</u> at 63.

[42] <u>Id.</u> at 68.

description from a probationary Corrections Counselor to a position with the Department of Welfare. Such demotion or job change may have caused a reasonable employee to reconsider making the complaint or to have been dissuaded from making it in the first instance, and hence qualifies as an adverse employment action for purposes of this motion.

The third prong of a *prima facie* case of retaliation requires the plaintiff to allege a causal connection between the protected activity and the adverse employment action.[43] The Third Circuit generally focuses on two main factors when finding this causal link: "timing and evidence of ongoing antagonism."[44] Close proximity in time between the protected activity and the adverse employment action is sufficient to establish a causal link.[45] Showing inconsistent or vague reasons for termination is also adequate to establish a causal link sufficient to fulfill this requirement.[46] In Abramson, the plaintiff non-tenured college professor wrote an informal letter to the college President complaining of religious discrimination.[47] Two weeks later she was informed that the President would not be recommending her for retention, which resulted in her termination.[48] The Court found that the plaintiff's proffered evidence of discrimination, coupled with the vague nature of the reasons stated for her termination, sufficed to establish a causal link

---

[43] Moore, 461 F.3d at 340.

[44] Abramson, 260 F.3d at 288 (citing Farrell v. Planters Life Ins. Co., 206 F.3d 271, 281 (3d Cir. 2000)).

[45] Woodson v. Scott Paper Co., 109 F.3d 913, 920-921 (3d Cir. 1997).

[46] See Abramson, 260 F.3d at 289; Farrell, 206 F.3d at 284; Waddell v. Small Tubes Prods., Inc., 799 F.2d 69, 73 (3d Cir. 1986).

[47] Abramson, 260 F.3d at 288.

[48] Id.

10

between the protected activity of sending an informal complaint letter and her termination.[49]

        Here, Plaintiff received her letter of termination less than two weeks after she engaged in protected activity by complaining about religious discriminatory harassment on a Course Evaluation form received by her employer, as well as to her supervisor, Ms. Smith.  Also, Plaintiff alleges that she was verbally informed that her termination was purportedly for being on "restricted premises."  However, she alleges that the "restricted premise" was simply an employee lounge and she was not cited for any other infraction as reason for her termination.  Her termination was later rescinded and Plaintiff was demoted to a position with the Department of Public Welfare without explanation.  This questionable reason for termination and subsequent rescission of termination, resulting in the Plaintiff's demotion, cast doubt on the propriety of the reasons for the Plaintiff's termination, as was the case in Abramson.  This uncertainty coupled with the close proximity between Plaintiff's protected activity and the adverse employment action are sufficient at this juncture of the litigation to establish the necessary causal connection for a retaliation claim.

        The plaintiff has made sufficient factual allegations to establish a *prima facie* claim of retaliation supporting a right to relief above the speculative level.  The plaintiff has therefore stated a claim for which relief can be granted, and the defendant's motion to dismiss this claim will be denied.

**B. Hostile Work Environment**

        A hostile work environment claim under Title VII is appropriate when "the

---

[49] Id. at 289.

workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment."[50] To establish a *prima facie* case of hostile work environment, a plaintiff must allege that (1) she suffered intentional discrimination because of her status as a member of a protected class; (2) the discrimination was [severe or pervasive];[51] (3) the discrimination detrimentally affected her; (4) the discrimination would detrimentally affect a reasonable person of the same protected class in the plaintiff's position; and, (5) the employer is liable under principles of respondeat superior.[52] In order to constitute a hostile work environment, an "environment must be objectively and subjectively offensive, one that the reasonable person would find hostile or abusive."[53] In determining whether a work environment is sufficiently severe or abusive, the Supreme Court directs courts to look to the totality of the circumstances, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes

---

[50] Hamera v. County of Berks, 2006 WL 1985791, at *5 (E.D. Pa. July 11, 2006) (quoting Oncale v. Sundowner Offshore Serv., Inc., 523 U.S. 75, 78 (1998) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993))); see also Meritor Savings Bank FSB v. Vinson, 477 U.S. 57, 65 (1986) ("Hostile work environment harassment occurs when unwelcome . . . conduct unreasonably interferes with a person's performance or creates an intimidating, hostile or offensive working environment").

[51] Originally the Third Circuit required "pervasive and regular" discrimination, but has since recognized the Supreme Court's "severe or pervasive" standard as controlling. Jensen v. Potter, 435 F.3d 444, 449 n. 3 (3d Cir. 2006) (overruled on other grounds by White, 548 U.S. 53).

[52] West v. Philadelphia Elec. Co., 45 F.3d 744, 753 (3d Cir. 1995) (citing Andrews v. City of Philadelphia, 895 F.2d 1469, 1482 (3d Cir. 1990)).

[53] Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998)(referring to Harris, 510 U.S. at 20-21); see also Weston v. Pennsylvania, 251 F.3d 420, 426 (3d Cir. 2001).

with the employee's work performance." [4][5]

The first element of a *prima facie* case of religion based hostile work environment requires a plaintiff to show that she was subjected to intentional discrimination because of her religion.[55] This is met by "merely a showing that the offender's behavior was . . . based on [religion]."[56] In Abramson, the Third Circuit found the first element of a *prima facie* case was made out where the plaintiff alleged that all incidents involving discriminatory harassment centered around her insistence that she not work on the Sabbath on account of her religion.[57]

Similarly, Plaintiff's allegations describe her religious practices, for example, Plaintiff's requests for special housing arrangements, as the source of much conflict between Plaintiff and Defendant's agents.[58] Officer Tann made it clear that she was angered by the Plaintiff's need for special housing arrangements, addressing the Plaintiff's request to share a dormitory with a fellow cadet by asking "do they get up a 4:00am to pray too?" and by apparently referring to Plaintiff's request for housing to accommodate her religious worship as "bullshit." Also, when Officer Ross singled out Plaintiff in front of the class, he mocked her religious attire, shouting that she had "all this stuff" on her head. Finally, when Lieutenant Montgomery

---

[54] Harris, 510 U.S. at 23; see also Weston, 251 F.3d at 426; Faragher, 524 U.S. at 788 ("discriminatory changes in the 'terms and conditions of employment'").

[55] Andrews, 895 F.2d at 1482.

[56] Abramson, 260 F.3d at 278 (citing Spain v. Gallegos, 26 F.3d 439, 447-478 (3d Cir. 1994) and Drinkwater v. Union Carbide Corp., 904 F.2d 653, 862 (3d Cir. 1990)).

[57] Id. at 279.

[58] See Amended Compl. ¶¶ 32-33 (alleges Plaintiff was treated differently than other cadets after her request for special housing to accommodate her religious practices), 42-43, 55-57 (disciplinary procedures that were enforced against the Plaintiff were not enforced against non-Islamic cadets).

recommended that Plaintiff's employment be terminated, he purportedly did so because her found Plaintiff to be problematic in the area of housing. Plaintiff's allegations are sufficient to fulfill the first requirement of a *prima facie* case of hostile work environment because they allege facts that support an inference that the conduct at issue centered around the Plaintiff's religion and religious activity.

        Defendant argues for dismissal of the hostile work environment claim on the grounds that allegations in the Amended Complaint are insufficiently pervasive or severe.[59] In order to fulfill the requirement of the second hostile work environment prong, the plaintiff must show that the discriminatory conduct was so pervasive or severe as to "change the terms and conditions of employment."[60] Considering a motion to dismiss, the court in <u>Clinkscales v. Children's Hospital of Philadelphia</u>, concluded that the alleged racial discrimination was pervasive and severe where the African American plaintiff was held to higher standards of conduct than white employees, where employer's agent monitored the plaintiff's phone calls and emails but did not monitor those of white employees, and where employer's agent humiliated the plaintiff at office meetings.[61] In contrast, the court in <u>Rone v. Mulvey</u> found that the plaintiff's allegations did not sufficiently describe severe or pervasive conduct to withstand a motion to dismiss where plaintiff was denied leave to attend a training session that white officers were permitted to attend, the plaintiff's work schedule was changed by one hour, he was restricted from going on major crime scenes, and he was notified that future leave requests would need to

---

[59] Memo. in Support of Motion to Dismiss ¶ 25.

[60] <u>Faragher</u>, 524 U.S. at 787.

[61] No. 06-3919, 2007 WL 3355604, at *5 (E.D. Pa. Nov. 9, 2007).

be approved by an inspector.[62]

Considering the totality of the circumstances[63] in the present case and comparing them to the cases cited above, Plaintiff's allegations are sufficiently severe and humiliating to withstand a motion to dismiss. After Plaintiff's initial request for special housing accommodations for religious practice, Defendant's supervisory employees began scrutinizing and monitoring Plaintiff more closely than other cadets. To coordinate special housing necessary to accommodate her religious practice, Plaintiff reported to Officer Tann. Officer Tann met Plaintiff's housing requests with taunting and ridicule, referring to Plaintiff's requests as "bullshit" and mocking her religious practice. Officer Ross, acting as the Plaintiff's instructor, humiliated Plaintiff in front of her class, identifying her religious attire mockingly as "all this stuff" on her head.  While non-Islamic cadets were both permitted to run in the hall when late to class and to sleep in class without adverse employment consequences, Plaintiff was cited for the identical action.  This treatment tracks closely the treatment experienced by the plaintiff in Clinkscales.  Moreover, other Third Circuit cases have cited incidents similar to those alleged by the Plaintiff as sufficient to fulfill the "severe or pervasive" requirement of a *prima facie* case of retaliation.[64]  For the purposes of the instant motion, the requirement is met as well.

---

[62] No. 06-3400, 2007 WL 951633 (E.D. Pa. Mar. 26, 2007).

[63] Harris, 510 U.S. at 23. In considering whether a hostile work environment claim is sufficient to amount to a hostile work environment, the Supreme Court directs courts to look at the totality of the circumstances, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the employees work performance."

[64] See e.g. Abramson, 260 F.3d at 279 (employer's "unprecedented" monitoring of employee's conduct to be one element that supported a hostile work environment claim); Weston v. Pennsylvania Dept. of Corrections, 251 F. 3d 420, 428 (3d Cir. 2001) (plaintiff made a claim for hostile work environment. Although the court noted that the plaintiff's complaint contained "little detail about the content of the offensive comments" and "failed to allege that the conduct altered the conditions of [the defendant's] employment," it ultimately found dismissal under 12(b)(6) inappropriate because the liberal nature of federal pleading requirements requires only that the plaintiff "provide a

Next, Plaintiff must allege facts that demonstrate that the discrimination adversely affected her and that the discrimination would have detrimentally affected a reasonable person in her position.[65] Defendant has not presented arguments to the Court with respect to either of these elements of Plaintiff's hostile work environment claim.

"A plaintiff need not have a nervous breakdown to recover for a hostile work environment claim . . . '[a] discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers,' [and] as long as the employee perceives the work environment as hostile, it is unnecessary for the environment to be 'psychologically injurious.'"[66] The plaintiff in Spain v. Gallegos was sexually harassed as a consequence of rumors that she was having an affair with a supervisor.[67] The Third Circuit Court of Appeals found that, by describing the nature of the environment, alleging she was affected by it and alleging that the environment led to her denied promotion, the plaintiff had shown that the work environment detrimentally affected her.[68]

---

statement sufficient to put the opposing party on notice of the claim"); Beaubrun v. Inter Cultural Family, No. 05-06688, 2007 WL 172385, at *6 (E.D. Pa. Jan. 17, 2007) (Considering a motion to dismiss, the court concluded that discrimination was pervasive and severe where Haitian plaintiff was called derogatory name by her supervisor, employees the plaintiff supervised followed this derogatory name-calling example, and where another employee made disparaging comments about Haitian immigrants in the United States).

[65] West, 45 F.3d at 753 (citing Andrews, 895 F.2d at 1482).

[66] Hall v. Pennsylvania Dept. of Corrections, No. 3: CV-02-1255, 2006 WL 2772551, at *9 (M.D. Pa. Sept. 26, 2008) (quoting Harris, 510 U.S. at 22).

[67] Spain v. Gallegos, 26 F.3d 329, 447 (3d Cir. 1994).

[68] Id.

Here, Plaintiff alleges that Defendant's acts "directly and irrevocably caused her damage and harm." She enumerates several specific instances of alleged discrimination and refers to multiple complaints she lodged with DOC authorities. Also, the ultimate effect of the discrimination was Plaintiff's demotion. Plaintiff's demotion, taken together with the nature of the environment and Plaintiff's perception that such environment was hostile, as evidenced by her complaints, suffice to support the inference that Plaintiff was adversely affected by the alleged harassment.

Plaintiff also alleges harassment that would affect a reasonable person. The court in Cubbage v. Bloomberg, L.P. found the plaintiff satisfied this standard by alleging disparate treatment, denied promotion, harassment and ridicule.[69] The court concluded that although the plaintiff failed to specify the exact nature of the comments, the allegations were "nonetheless . . . sufficient 'to raise a right to relief above the speculative level.'"[70] Here, as in Cubbage, Plaintiff alleges disparate treatment,[71] demotion,[72] harassment[73] and ridicule,[74] which would detrimentally affect a reasonable person in her position. The allegations in this respect are therefore sufficient to withstand a motion to dismiss.

Finally, Plaintiff must allege facts to show that respondeat superior liability

---

[69] No. 05-2989, 2008 WL 1836668, at *6 (E.D. Pa. April 22, 2008).

[70] Id. (quoting Twombly, 127 S.Ct. at 1965).

[71] See Amended Compl. ¶¶ 41-42.

[72] See id. ¶¶ 76-78.

[73] See id. ¶¶ 17, 32-34, 36-37, 43-46, 75, 86.

[74] See id. ¶ 43.

exists.[75] In the hostile work environment context this may be established by showing that the defendant knew or had reason to know of the discriminatory conditions and failed to take remedial action.[76] Plaintiff alleges that, on at least two occasions, she reported "unlawful religious discriminatory harassment" on a Basic Training Course Evaluation form that was received by employer, and also that she twice made the alleged harassment known to her supervisor, Smith. These appear to have been two standard channels for communication of grievances available to cadets like Plaintiff. These allegations suggest that either the Defendant knew or should have known of the discriminatory conduct. Nothing before the Court appears to suggest that the defendant employer did anything to remedy the situation. Having pleaded Defendant's knowledge of the discrimination and its failure to remedy the situation, Plaintiff has sufficiently alleged respondeat superior liability, and thus has made out a *prima facie* claim of hostile work environment.

Accordingly, Defendant's motion to dismiss this claim is inapt and will be denied.

**IV. Conclusion**

Plaintiff's complaint contains factual allegations that sufficiently present *prima facie* cases of both retaliation and hostile work environment, raising a right to relief for each claim above the speculative level. Dismissal of these claims is therefore inappropriate and this Court denies the Defendant's Motion to Dismiss in its entirety.

An appropriate Order follows.

---

[75] West, 45 F.3d at 753 (citing Andrews, 895 F.2d at 1482).

[76] Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 744 (1998); see also Brooks v. City of Philadelphia, No. 06 – 4174, 2007 WL 773720, at *3 (E.D. Pa. Mar. 09, 2007) (citing Andrews, 895 F.3d at 1486 (Employer may be held liable for the hostile work environment created by its employee where the "employer knew or should have known of the harassment and failed to take remedial action")).

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| **SHARON BAKER-BEY,** | : | |
| Plaintiff, | : | |
| v. | : | CIVIL NO. 06-CV-5490 |
| | : | |
| **PENNSYLVANIA DEPARTMENT OF CORRECTIONS,** | : | |
| Defendant. | : | |

## ORDER

**AND NOW,** this 23rd day of July 2008, upon consideration of Defendant's Motion to Dismiss the Amended Complaint [Doc. No. 16], and all filings related thereto, and for the reasons set forth in the attached Memorandum Opinion, it is hereby **ORDERED** that the Motion is **DENIED**, and that Plaintiff's claims under the Pennsylvania Human Relations Act and for punitive damages are **DISMISSED** as withdrawn.

It is so **ORDERED**.

**BY THE COURT:**

/s/ Cynthia M. Rufe

**CYNTHIA M. RUFE, J.**